NIEMEYER, Circuit Judge,
concurring in part and dissenting in part:
This is a straightforward contract dispute between two telecommunications companies, CoreTel and Verizon, over the fees each agreed to pay the other in interconnecting their networks. When Verizon pressed CoreTel to pay over $880,000 in past-due amounts for “entrance facilities” that CoreTel leased from Verizon, CoreTel commenced this action.
While each party has disputed various amounts payable to the other, the principal dispute, on which I disagree with the majority, is whether CoreTel agreed to pay Verizon a tariff rate or a lower cost-based rate for lease of Verizon’s entrance facilities for the purpose of interconnection. Reading the contract as a whole and in context, I conclude that it clearly required CoreTel to pay tariff rates, as the district court also concluded.
I respectfully submit that the majority has rewritten this private agreement to bring it in line with what CoreTel might have been able to obtain through negotiations when it signed the contract, based on changing interpretations of the Telecommunications Act of 1996, which regulates such agreements. That is, it focuses on what CoreTel could have demanded under the law, not on what CoreTel actually agreed to accept when it executed the written contract. No one contends that the written contract was or is unenforceable or *376 not in compliance with the Telecommunications Act. Indeed, the Telecommunications Act itself allows the parties to negotiate the rates and fees to be paid for connecting networks. See 47 U.S.C. § 252.
Thus, I would enforce the contract according to its terms and affirm the judgment of the district court.
I.
Verizon (referring collectively to Verizon Virginia LLC and Verizon South Inc.) is an incumbent local exchange carrier (“incumbent LEC”) that has been providing telephone exchange services throughout Virginia since before the enactment of the Telecommunications Act of 1996. In enacting that Act, Congress sought to introduce competition in the telecommunications market by lowering the barriers to entry for would-be competitors. To this end, the Act requires incumbent LECs to share their networks with any competitive local exchange carrier (“competitive LEC”) and allow the competitive LEC (1) to lease from the incumbent LEC unbundled network elements (ie., “a la carte” network elements enabling the competitive LEC “to create its own network without having to build every element from scratch,” Talk Am., Inc. v. Mich. Bell Tel. Co., - U.S. -, 131 S.Ct. 2254, 2258, 180 L.Ed.2d 96 (2011)) and (2) to interconnect with the incumbent LEC’s network.
These obligations are codified in two statutory provisions. Section 251(c)(3) of the 1996 Act requires incumbent LECs to provide competitive LECs with “nondiscriminatory access to network elements on an unbundled basis.” 47 U.S.C. § 251(c)(3) (emphasis added). And, in a similar vein, § 251(c)(2) requires an incumbent LEC “to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier’s network ... for the transmission and routing of telephone exchange service and exchange access.” Id. § 251(c)(2) (emphasis added). For such unbundled network elements and interconnection, the incumbent LEC may only charge “rates, terms, and conditions that are just, reasonable, and nondiserimi-natory.” Id. §§ 251(c)(2)(D), 251(c)(3). But the Telecommunications Act makes clear that those rates, terms, and conditions are subject to negotiation by the parties. See id. § 252(a).
CoreTel Virginia, LLC, is a competitive LEC that, like Verizon, serves customers in Virginia. When it requested unbundled network elements and interconnection from Verizon, the parties entered into an agreement on November 16, 2004 (“2004 Adoption Agreement”), which adopted the terms and conditions of an earlier, 2002 arbitrated interconnection agreement between Verizon and Cox Virginia Telcom, Inc. (“2002 Interconnection Agreement”). The 2004 Adoption Agreement incorporated all the terms and conditions of the 2002 Interconnection Agreement with several modifications, including a modification that the 2004 Adoption Agreement “[did] not include adoption of any provision [in the 2002 Interconnection Agreement] imposing an unbundling obligation on Verizon” because, as the 2004 Adoption Agreement explained, that obligation no longer applied to Verizon as a result of a 2003 FCC order, In re Review of Section 251 Unbundling Obligations of Incumbent Local Exch. Carriers (“2003 Triennial Order”), 18 FCC Red. 16978 (2003), and subsequent related decisions.
With respect to the “entrance facilities” that are at issue in this case, the 2002 Interconnection Agreement authorized CoreTel to interconnect through, among other options, “an Entrance Facility ... leased from Verizon ... in accordance with ... terms and conditions, including *377 without limitation, rates and charges set forth [1] in this Agreement, [2] in any applicable Tariff(s), or [3] as may be subsequently agreed to between the Parties.” 2002 Interconnection Agreement, §§ 4.3.1, 4.3.3. The “rates and charges set forth in this Agreement” were those described in Exhibit A, entitled “Detailed Schedule of Itemized Charges.” Exhibit A included a category of rates called “Unbundled Transport,” under which it specified rates for “Entrance Facilities,” as are at issue here. And the terms for unbundled transport were set forth in § 11 of the Agreement. The parties agree that Exhibit A’s rates and charges were cost-based. Under the terms of the 2004 Adoption Agreement, however, Verizon’s unbundling obligations were eliminated, leading Verizon to bill CoreTel for entrance facilities not as unbundled elements under the cost-based rate in Exhibit A, but as entrance facilities under Verizon’s tariff rates.
Although Verizon thus billed CoreTel each month over the course of some eight years for entrance facilities at tariff rates, CoreTel maintained that it should only have been charged cost-based rates and refused even to pay those rates, making only a single payment of $591.95 in February 2006. By the time of this litigation, it had run up a bill of over $880,000, based on Verizon’s billings at tariff rates.
When Verizon sent CoreTel notice of default and threatened to terminate service, CoreTel commenced this action. While the parties have fought over various amounts owed, the main issue presented to us on appeal is whether the 2002 Interconnection Agreement, as modified by the 2004 Adoption Agreement, entitled Core-Tel to pay only cost-based rates for entrance facilities for the purpose of interconnection instead of the tariff rates that Verizon billed.
The district court concluded that the 2002 Interconnection Agreement did not give CoreTel a right to lease entrance facilities for interconnection at cost-based rates, even though CoreTel could have insisted on such rates when the 2004 Adoption Agreement was executed. Despite this legal right, the district court noted that CoreTel was bound by the terms of the contract to which it actually agreed. The court thus entered judgment in favor of Verizon.
II.
Based on the contract as written, I agree with the district court and conclude that CoreTel was required to pay tariff rates for entrance facilities, as Verizon billed it.
The structure of the obligations between the parties is readily apparent from the agreement taken as a whole. Section 4.3.1 of the 2002 Interconnection Agreement authorized CoreTel to specify any of three different methods by which to connect with Verizon’s network, including through “an Entrance Facility.” And § 4.3.3 provided that the rates and charges for such facilities were as (1) “set forth in this Agreement,” (2) “set forth ... in any applicable Tariff(s),” or (3) “as may be subsequently agreed to between the Parties.” But critically, § 4.3.3 did not directly refer to any rates. In fact, the only rates for entrance facilities actually “set forth in the Agreement,” were referenced in § 11, which governed only unbundled access. Section 11 addressed “interoffice transmission facilities” and provided that “Verizon shall provide [CoreTel] with dedicated local transport, common local transport in conjunction with unbundled local switching, unbundled interoffice transmission facilities, and other services in accordance with Exhibit A.” 2002 Interconnection Agreement, § 11.6 (emphasis added). *378 And part II of Exhibit A listed cost-based rates for unbundled elements, including a cost-based rate for “Entrance Facilities.” Id. Exhibit A, part II.C. No other part of Exhibit A mentioned entrance facilities; they were listed only under “Unbundled Transport.”
In short, the 2002 Interconnection Agreement provided that entrance facilities were to be billed either at tariff rates or, if leased as unbundled elements, at cost-based rates as set forth in Exhibit A. Those rates were the only “rates and charges” “set forth” in the 2002 Interconnection Agreement. Thus, under the 2002 Agreement, if charges for entrance facilities were not payable in accordance with Exhibit A, they were only payable at tariff rates.
The 2002 Interconnection Agreement’s provisions allowing for purchase of unbundled network elements at cost-based rates were, at the time (in 2002), necessitated by 47 U.S.C. § 251(c)(3), which required Verizon, as an incumbent LEC, to provide any requesting competitive LEC, such as Cor-eTel, unbundled network elements at a reasonable, nondiscriminatory rate. And that rate was established by the FCC, in interpreting § 251(c)(3), to be its cost-based TELRIC rate (standing for Total Element Long-Run Incremental Costs) — a rate “based on the hypothetical construction and operation of the most efficient local network conceivable.” GTE South, Inc. v. Morrison, 199 F.3d 733, 747 (4th Cir.1999).
After the 2002 Interconnection Agreement was executed, however, the law regarding § 251(c)(3)’s unbundling requirements changed. The FCC, in its 2003 Triennial Order, interpreted § 251(c)(3) not to require incumbents to provide competitive LECs with entrance facilities as unbundled network elements at cost-based rates. Instead, the FCC concluded that entrance facilities must be provided at cost-based rates only for the limited purpose of interconnection:
We conclude that our previous definition [of § 251(c)(3) ] was overly broad. As we explain in this Part, competitive LECs often use transmission links including unbundled transport connecting incumbent LEC switches or wire centers in order to carry traffic to and from its end users.... Unlike the facilities that incumbent LECs explicitly must make available for section 251(c)(2) interconnection, we find that the Act does not require incumbent LECs to unbun-dle transmission facilities connecting incumbent LEC networks to competitive LEC networks for the purpose of back-hauling traffic.
In reaching this determination we note that, to the extent that requesting carriers need facilities in order to interconnect with the [incumbent LEC’s] network, section 251(c)(2) of the Act expressly provides for this and we do not alter the Commission’s interpretation of this obligation.
2003 Triennial Order, 18 FCC Red. ¶ 365, at 17203-04 (alterations in original) (emphasis added) (footnotes omitted) (internal quotation marks omitted). The Supreme Court has since embraced that Order, stating that entrance facilities must be leased at cost-based rates for the purpose of interconnection only. See Talk America, 131 S.Ct. at 2258-60.
The parties were aware of these developments when they contracted in 2004. Accordingly, they included a provision eliminating any unbundling obligation in their 2004 Adoption Agreement:
For avoidance of doubt, adoption of the Terms does not include adoption of any provision imposing an unbundling obligation on Verizon that no longer applies *379 to Verizon under the [2003 Triennial Order and related case law],
2004 Adoption Agreement, § l.B. It is incontrovertible that, by reason of that language, CoreTel was not entitled to lease entrance facilities as unbundled network elements pursuant to § 251(c)(3). Indeed, CoreTel notes in its briefing that it “never ordered [an unbundled network element], period.” And with the elimination of the unbundling obligation, the rates for unbundled elements were rendered inapplicable, including the rate for “Entrance Facilities.”
But CoreTel contends that the 2002 Interconnection Agreement nonetheless required that Verizon provide entrance facilities under § 251(c)(2) at the cost-based rates in Exhibit A. It argues, and the majority accepts, that § 4.3.3 of the 2002 Interconnection Agreement explicitly provided for “interconnection” at the rates “set forth in this Agreement” and that those rates were the cost-based rates provided in Exhibit A, even though the rates in Exhibit A were specifically for unbundled elements. Under CoreTel’s view, § 4.3.3 did not specify whether Verizon had to provide interconnection via leases of entrance facilities as unbundled elements under § 251(c)(3) (its right to which was abrogated under the 2004 Adoption Agreement) or for purposes of interconnection only, as under § 251(c)(2). Thus, it argues, its rights to purchase entrance facilities for interconnection were not affected by the 2004 Adoption Agreement, which only eliminated Verizon’s unbundling obligation under § 251(c)(3).
This argument, however, ignores both the explicit language of the 2002 Interconnection Agreement and the 2004 Adoption Agreement, as well as the underlying litigation that led to the 2002 Agreement. As pointed out above, the only rates expressly provided for entrance facilities in the 2002 Interconnection Agreement were rates for unbundled facilities. And when Verizon’s unbundling obligation was eliminated, so too were the corresponding rates for unbundled elements. Thus, the only other rates available for entrance facilities were tariff rates.
Just as indicative of this point is the history of the litigation leading to the 2002 Interconnection Agreement. That Agreement, as well as similar agreements involving Verizon, was created as a result of an FCC arbitration order. In re WorldCom, Inc., 17 FCC Rcd. 27039 (2002). And paragraphs 210 through 217 of that order described the dispute between Verizon and Cox (as well as other competitive LECs) as to “Interconnection Transport,” with the competitive LECs asserting that such interconnection had to be provided at unbundled network rates, and Verizon arguing that Cox and the other competitive LECs had to “purchase ‘entrance facilities and transport for interconnection’ from its access tariffs.” Id. ¶ 210, at 27142 (emphasis added). These paragraphs of the FCC order described the provision of interconnection exclusively in the context of the purchase of unbundled elements pursuant to § 251(c)(3). See id. ¶ 215 & n. 716, at 27144. Nowhere in this discussion was there any reference to Cox or the other competitive LECs having the right to purchase entrance facilities for the limited purpose of interconnection pursuant to § 251(c)(2). Entrance facilities were instead only discussed in the order as unbundled network elements. See id. ¶¶ 210-217, at 27142-46.
The FCC’s reasoning, which is based exclusively on § 251(c)(3), is clearly what gave rise to § 4.3.1 of the 2002 Interconnection Agreement. The FCC order defined the proper rates at which Cox and other involved competitive LECs could “order ‘[e]ntranee facilities and transport *380 for [interconnection.’ ” Id. ¶ 217, at 27145. This language is nearly identical to § 4.3.1 of the 2002 Interconnection Agreement, which allowed Cox to specify “an entrance facility and transport” as its interconnection method. Based on this, it is clear that § 4.3.3 of the 2002 Interconnection Agreement provided for the purchase of entrance facilities as unbundled network elements, and the obligation to provide unbundled network elements at cost-based rates was eventually removed from the contract through the 2004 Adoption Agreement.
This interpretation is also supported by Exhibit A itself. All of the cost-based rates in Exhibit A for “entrance facilities” were listed under the heading “Unbundled Transport.” Yet CoreTel now wants to apply those rates to the purchase of entrance facilities that it explicitly claims were not unbundled. It fails to recognize that Exhibit A’s rates for unbundled elements were removed from the Agreement through the 2004 Adoption Agreement, and they were never applicable to entrance facilities except as an unbundled element. And absent any Exhibit A rate for entrance facilities, the only rates given by the 2002 Interconnection Agreement for entrance facilities were tariff rates. See 2002 Interconnection Agreement, § 4.3.3.
There is a reason why the 2002 Interconnection Agreement did not contain special rates for entrance facilities provided solely for interconnection. Before the FCC’s 2003 Triennial Order, the general understanding was that incumbent LECs had no obligation under § 251(c)(2) to provide entrance facilities at cost-based rates. That section was limited to “interconnection” — a service, not a facility. Entrance facilities were always provided as unbundled network elements under § 251(c)(3). This was rational, as it allowed the competitive LECs the greatest flexibility in using the entrance facilities. This pre-2003 understanding of the law was explicitly affirmed by the FCC in its amicus brief in Talk America, to which the Supreme Court deferred as an agency interpretation. That brief stated:
The FCC’s interconnection rules, which were adopted in 1996, do not expressly require incumbents to provide entrance facilities to satisfy their interconnection obligations under Section 251(c)(2). That is because, until 2003 — when the FCC eliminated unbundled access to entrance facilities in the Triennial Review Order — a competitive LEC typically would elect to order a cost-priced entrance facility under Section 251(c)(3) since an unbundled network element can be used more expansively than the same facility provided solely for interconnection under Section 251(c)(2). Only after the FCC eliminated access to entrance facilities as unbundled network elements did it have occasion to clarify, in the Triennial Review Order and the Triennial Review Remand Order, that Section 251(c)(2) gives competitive LECs a right of access to such facilities for interconnection at cost-based rates.
Brief for the United States as Amicus Curiae Supporting Petitioners, at 22 n. 6, Talk America, 131 S.Ct. 2254 (Nos.10-313, 10-329) (emphasis added) (citations omitted).
Thus, because § 251(c)(2) was never understood in 2002 to require the provision of entrance facilities, only “interconnection” as a service, the majority has no support for reading the 2002 Interconnection Agreement now to include such an obligation on Verizon. Instead, the drafting parties uniformly treated entrance facilities in the only way known at the time — as unbundled elements to be provided under § 251(c)(3). And they included provisions *381 in § 11.6 and Exhibit A allowing for the leasing of entrance facilities as such.
CoreTel points to § 27.1 of the 2002 Interconnection Agreement to suggest that Verizon’s obligations changed with the 2003 Triennial Order. That paragraph provided:
Each Party shall remain in compliance with [applicable ... federal, state, and local laws, rules and regulations in the course of performing this Agreement. Each Party shall promptly notify the other Party in writing of any governmental action that suspends, cancels, withdraws, limits, or otherwise materially affects its ability to perform its obligations hereunder.
But CoreTel can point to no change in the law that “materially affect[ed]” either party’s “ability ” to perform its obligations under the Agreement. The Telecommunications Act always provided that the rates to be paid to an incumbent LEC were subject to negotiation, even as the Act requires that any rates be reasonable and nondiscriminatory. See 47 U.S.C. § 252(a), (d). Moreover, CoreTel’s reading of § 27.1 cannot be squared with other provisions of the 2002 Interconnection Agreement. For example, § 27.3 — which required the parties to negotiate in good faith to incorporate changes in the law— would be rendered superfluous under Cor-eTel’s reading of § 27.1.
Finally, CoreTel argues that even if the 2002 Interconnection Agreement did not explicitly allow for its leasing of entrance facilities at the cost-based rates listed in Exhibit A, the 2004 Adoption Agreement effectively incorporated the FCC’s 2003 Triennial Order into the contract to allow it to do so. This claim, however, finds no support in the language of the 2004 Adoption Agreement. That Agreement stated that it “does not include adoption of the provisions imposing an unbundling obligation that no longer applies” after the 2003 Triennial Order. This is a limitation on the terms of the contract, not an addition to it. If no § 251(c)(2) cost-based pricing duty can be found in the 2002 Interconnection Agreement, the 2004 Adoption Agreement does not add one. Indeed, it adds nothing at all. Rather, it strikes out the unbundling requirements in § 11 of the 2002 Interconnection Agreement because those provisions related to obligations that “no longer applfled]” following the 2003 Triennial Order, just as the 2004 Adoption Agreement explicitly stated.
If CoreTel had wanted to change the terms of the 2002 Interconnection Agreement as modified by the 2004 Adoption Agreement, it could have done so at any point under § 27.3. Indeed, it could have sought an entirely new Agreement with Verizon in 2004 rather than agreeing to adopt one that was drafted prior to the 2003 Triennial Order. But CoreTel did none of these things, and thus it is bound by the language of the 2002 Interconnection Agreement as modified by the 2004 Adoption Agreement. See In re Core Commc’ns, Inc., 18 FCC Red. 7568, 7582 § 32 (2003) (holding that a party to an Interconnection Agreement “cannot rely upon the general section 251 duties to circumvent the terms of its agreement”).
In sum, based on the language of the 2002 Interconnection Agreement and the 2004 Adoption Agreement, as well as the context of those Agreements, I cannot conclude that CoreTel is now entitled to pay only cost-based rates for its lease of entrance facilities for interconnection. Rather, as the Agreements provide, it is required to pay for those entrance facilities at tariff rates, the only other rate provided for in the Agreements.
*382 I would accordingly affirm the judgment of the district court in all respects.